1  **BURSOR & FISHER, P.A.**
   Sarah N. Westcot (State Bar No. 264916)
2  701 Brickell Ave., Suite 2100
   Miami, FL 33133-5402
3  Telephone: (305) 330-5512
   Facsimile:  (305) 676-9006
4  E-mail: swestcot@bursor.com

5  *Attorney for Plaintiff*

6

7

8

9

10                    **UNITED STATES DISTRICT COURT**

11                    **SOUTHERN DISTRICT OF CALIFORNIA**

12
   G.M., individually and on behalf of all other      Case No. **'24CV2297 AJB  BJC**
13 persons similarly situated,

14                                                     **CLASS ACTION COMPLAINT**
                           Plaintiff,
15                                                     **JURY TRIAL DEMANDED**
                 v.
16
   IDEAL IMAGE DEVELOPMENT
17 CORPORATION,

18                         Defendant.

19

20

21

22

23

24

25

26

27

28

Plaintiff G.M. ("Plaintiff") brings this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant Ideal Image Development Corporation ("Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## **NATURE OF THE ACTION**

1.    This is a class action lawsuit on behalf of all California residents who accessed https://www.idealimage.com (the "Website") to schedule a consultation for medical treatment and/or services.

2.    Defendant provides an array of medical services to its patients, including fat loss procedures, injectable toxin and filler services, and laser hair removal procedures.  All of Defendant's services are performed by trained medical professionals, and each of Defendant's over 150 locations is overseen by a licensed medical doctor.

3.    When booking medical services online, patient privacy is crucial.  Patients expect, as they should, that their information will be held in confidence and not shared with third parties without their knowledge or consent.  The sensitive nature of information related to weight loss and body image amplifies the need for privacy during online bookings.  Weight loss procedures often involve deeply personal details about an individual's physical appearance, struggles with body image, and health history.  This information can be emotionally charged and stigmatizing, making the protection of such data especially critical.

4.    Moreover, information concerning an individual's healthcare, including medical procedures, is protected by state and federal law.  Despite these protections, and unbeknownst to Plaintiff and Class Members, Defendant aided, employed, agreed, and conspired with Facebook[1] to intercept sensitive and confidential communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.  Plaintiff brings

---

[1] In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc. Unless otherwise indicated, Facebook, Inc. and Meta Platforms, Inc. are referenced collectively as "Facebook."

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

this action for legal and equitable remedies resulting from these illegal actions.

**PARTIES**

5.      Plaintiff is an adult citizen of the state of California and is domiciled in San Diego, California.

6.      In or around October 2023, Plaintiff used the Website to book a consultation for a CoolSculpting fat loss procedure at one of Defendant's medical facilities in San Diego California. During the booking process, Plaintiff disclosed to Defendant that she was specifically interested in receiving CoolSculpting treatment.  Unbeknownst to Plaintiff, Defendant assisted Facebook with incepting Plaintiff's communications, including those that contained personally identifiable information ("PII"), protected health information ("PHI"), and related confidential information. Defendant assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.  As a consequence of these interceptions, Plaintiff has received advertisements marketing body contouring and other weight loss procedures, specifically targeted at Plaintiff as a result of Defendant's disclosure of her medical booking information to Facebook.  Defendant breached its duties of confidentiality by unlawfully disclosing Plaintiff's PII and PHI.

7.      Plaintiff has maintained a Facebook account at all times prior to and after booking a consultation through the Website. Plaintiff routinely accesses her Facebook account through an app on her phone and her computer.  Due to the surreptitious nature of the interceptions at issue, Plaintiff was not aware that Defendant assisted Facebook in unlawfully intercepting her PII and PHI under approximately June 2024.

8.      Defendant Ideal Image Development Corporation owns and operates a national network of medical clinics specializing in procedures like laser hair removal, fat reduction, and filler injections.  At all relevant times, Defendant had physical clinic locations in multiple states, including California.  Defendant is a Florida corporation with its principal place of business at 1 North Dale Mabry Hwy, Suite 1200, Tampa, FL 33609.  Defendant owns and operates the Website, whereby consumers seeking to procure medical procedures can schedule both virtual and in-person consultations for medical procedures, including at clinics located within California.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.  Further, this action is a putative class action, and Plaintiffs allege that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

10.     This Court has personal jurisdiction over Defendant because Defendant purposefully availed themselves of this forum by conducting substantial business within California such that Defendant has significant, continuous, and pervasive contracts with the State of California.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.     Background of the California Information Privacy Act**

12.     The California Information Privacy Act ("CIPA"), California Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received anywhere within California.

13.     To establish liability under California Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

14.     Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" including computers, the internet, and email. *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

15.     Under California Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**B.     Background of the California Confidentiality of Medical Information Act**

16.     Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in

4

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

subdivision (b) or (c)." Cal. Civ. Code § 56.10(a).[2] "An authorization for the release of medical information . . . shall be valid if it:

(a) Is handwritten by the person who signs it or is in a typeface no smaller than 14-point type.

(b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.

(c) Is signed and dated . . .

(d) States the specific uses and limitations on the types of medical information to be disclosed.

(e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(f) States the name or functions of the persons or entities authorized to receive the medical information.

(g) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

(h) States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

(i) Advises the person signing the authorization of the right to receive a copy of the authorization."

Cal. Civ. Code § 56.11.

17.     Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and protected health information. Cal. Civ. Code § 56.36(c).[3]  Similarly, if a negligent

---

[2] Subdivisions (b) and (c) are not relevant to this case but permit the disclosure of medical information in situations where a government investigation or lawsuit is taking place. For example, Defendant could bypass the authorization requirement if patient medical information was requested pursuant to a lawful court order or by a party to a proceeding before a court or administrative agency pursuant to a subpoena. *See* Cal. Civ. Code §§ 56.10(b)(3) and 56.10(b)(6).

[3] "Every provider of health care . . . who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

> In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. [¶] (2) The amount of actual damages, if any, sustained by the patient.

*Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551, 174 Cal. Rptr. 3d 653, 656 (2014) (quoting Cal. Civ. Code § 56.36(b)).

### C.    Facebook's Platform and its Business Tools

18.    Facebook describes itself as a "real identity platform,"[4] meaning users are allowed only one account and must share "the name they go by in everyday life."[5]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[6]

19.    In 2023, Facebook generated over $134 billion in revenue.[7]  With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[8]

20.    Facebook sells advertising space by highlighting its ability to target users.[9]

---

information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal. Civ. Code § 56.101, subd. (a).

[4] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[5] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[6] FACEBOOK, SIGN UP, https://www.facebook.com.

[7] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2023 RESULTS; INITIATES QUARTERLY DIVIDEND, https://s21.q4cdn.com/399680738/files/doc_financials/2023/q4/Meta-12-31-2023-Exhibit-99-1-FINAL.pdf, at 1.

[8] *Id.* at 10.

[9] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Facebook can target users so effectively because it surveils user activity both on and off its site.[10] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[11]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[12]

21.     Advertisers can also build "Custom Audiences."[13]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[14]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[15]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Facebook's "Business Tools."[16]

22.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might

---

[10] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[11] FACEBOOK, AUDIENCE AD TARGETING: HOW TO FIND PEOPLE MOST LIKELY TO RESPOND TO YOUR AD, https://www.facebook.com/business/ads/ad-targeting.

[12] FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[13] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[14] FACEBOOK, AUDIENCE AD TARGETING: HOW TO FIND PEOPLE MOST LIKELY TO RESPOND TO YOUR AD, https://www.facebook.com/business/ads/ad-targeting.

[15] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[16] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

be interested in their products and services."[17]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

23.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[18]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[19]  Advertisers can even create their own tracking parameters by building a "custom event."[20]

24.     One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to advertisers, like Defendant, to integrate into their website.  As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[21]  When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers.  This second secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's

---

[17] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[18] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[19] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[20] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[21] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

attempt to load and read https://www. idealimage.com—Defendant's own code and Facebook's embedded code.

25.    An example illustrates the point. Take an individual who, at relevant times, navigated to https://www.idealimage.com and, as Plaintiff did, requested a consultation by clicking the "Free Consultation" icon.  When clicked, the individual's browser sent a GET request to Defendant's server requesting that server to load the particular webpage.  As a result of Defendant's use of the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening.  Facebook caused the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribed the communication's content and the individual's identity.  This process is illustrated in Figures 1 and 2 below.

**Figures 1 and 2:**

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

26.     After a patient fills out the form shown in Figure 1 on the Ideal Image Website and clicks "SUBMIT," Defendant assists Facebook in intercepting confidential information related to the medical procedure they are booking a consultation for.

27.     Each time Defendant sent this activity data, it disclosed customers' PII, including their Facebook ID. A Facebook ID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique Facebook ID, so too can any ordinary person who comes into possession of a Facebook ID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the Facebook ID can connect to any Facebook profile.

28.     A user who accessed https://www.idealimage.com while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

29.     When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

30.     One such cookie was the "fr cookie" which contained, at least, an encrypted Facebook ID and browser identifier.[22]  Facebook, at a minimum, used the fr cookie to identify users.[23]

31.     If a visitor had never created an account, an even smaller set of cookies was transmitted.

32.     At each stage, Defendant also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[24]

33.     The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[25] Otherwise, the c_user cookie is cleared when the browser exits.[26]

34.     The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[27] If that happens, the time resets, and another 90 days begins to accrue.[28]

35.     The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[29] If that happens, the time resets, and another 90 days begins to accrue.[30]

36.     The Facebook Tracking Pixel used both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, https://www.idealimage.com.[31]  A third-party cookie is "created by a website with a domain name other than the one the user is

---

[22] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[23] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[24] *Id.*

[25] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[26] *Id.*

[27] *See id.*

[28] Confirmable through developer tools.

[29] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[30] Also confirmable through developer tools.

[31] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

currently visiting"—*i.e.*, www.facebook.com.[32]  The _fbp cookie was always transmitted as a first-party cookie.  A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

37.     Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles. Defendant sent these identifiers alongside the event data.

38.     After collecting and intercepting the information described in the preceding paragraph, Facebook processed it, analyzed it, and assimilated it into datasets like Core Audiences and Custom Audiences for targeted advertising purposes.

### D.     Plaintiff Never Provided Defendant or Facebook with Consent to Intercept Her Sensitive and Confidential Personally Identifiable Information

39.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her confidential and sensitive PII or PHI.  In fact, Defendant expressly warranted the opposite.

40.     For each patient who accesses the Website, Defendant's "cookie banner" provides that it will not assist a third party with intercepting communications that are paired with PII, as shown below in Figure 3.

### Figure 3:



Targeting Cookies

These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

---

[32] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

41.     The Facebook Tracking Pixel is commonly known as a "Targeting Cookie."[33]

42.     As Figure 3 demonstrates, Defendant expressly warrants that the "Targeting Cookies" on its Website "do not store directly personal information, but are based on uniquely identifying your browser and internet device."

43.     As courts across the country have recognized, however, the identifiers that the Facebook Tracking Pixel captures—Facebook ID, email address, first name, last name, and phone number—constitute "directly personal information."

44.     Plaintiff was never provided with any written notice that Defendant disclosed its patients PII or PHI.  Defendant nonetheless knowingly disclosed to Facebook her sensitive and confidential PII and PHI.

45.     Facebook likewise never received consent to intercept sensitive, protected information.  In fact, Facebook expressly warrants the opposite, promising to shield that information from disclosure.

46.     When first signing up, a Facebook user assents to three agreements: the Terms of Service,[34] the Cookies Policy,[35] and the Data Policy.[36]

47.      Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[37]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[38]

48.     Facebook's Data Policy recognizes that there may be "[d]ata with special

---

[33] https://www.cookiepro.com/knowledge/what-are-targeting-advertising-cookies/#:~:text=Examples%20of%20targeting%20and%20advertising,them%20on%20social%20media%20platforms ("Examples of targeting and advertising cookies include social media cookies that are placed on sites to track users around the web to provide ads to them on social media platforms.").

[34] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[35] FACEBOOK, COOKIES POLICY, https://www.facebook.com/policies/cookies/.

[36] FACEBOOK, DATA POLICY, https://m.facebook.com/about/privacy/update/printable.

[37] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[38] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

protections," meaning information that "could be subject to special protections under the laws of your country."[39]  The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[40]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[41]

49.     Facebook then offers an express representation: "**We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us**."[42] Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[43]

50.     Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[44]

51.     Facebook's other representations further reinforce these warranties.  In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[45] And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[46]  Facebook does not "want websites or apps sending us sensitive information about people."[47]  Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[48]

---

[39] FACEBOOK, DATA POLICY, https://m.facebook.com/about/privacy/update/printable.

[40] *Id.*

[41] *Id.*

[42] *Id.* (Emphasis added).

[43] *Id.*

[44] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[45] FACEBOOK, INTRODUCTION TO ADVERTISING STANDARDS, https://www.facebook.com/policies/ads/.

[46] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565.

[47] *Id.*

[48] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

52.     These representations are repeated frequently.  Facebook created a "Help Center" to better explain its practices to users.  In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[49]  In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[50]

53.     Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

**E.     Warning on Tracking Codes on Health Care Websites**

54.     The federal government has issued guidance warning that tracking code like the Facebook Tracking Pixel may violate federal privacy law when installed on healthcare websites such as Defendant's. The statement titled, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022.[51]

55.     Healthcare organizations regulated under the Health Insurance Portability and Accountability Act (HIPAA) may use third-party tracking tools, such as the Facebook Tracking Pixel, in a limited way, to perform analysis on data key to operations. They are not permitted,

---

[49] FACEBOOK, HOW META RECEIVES INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[50] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

[51] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEP'T HEALTH AND HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last updated Mar. 18, 2024).

however, to use these tools in a way that may expose patients' PHI to these vendors. The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures***.[52]

56.     The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI***. Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment***. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule***.[53]

57.     Plaintiff and Class Members face the risks about which the government expresses concern.  Defendant disclosed the fact that Plaintiff and Class Members requested medical consultations on Defendant's Website, which in turn also disclosed the medical procedure(s) for which they sought a health care provider. This information is, as described by the OCR in its bulletin, "highly sensitive."

58.     The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code***.[54]

---

[52] *Id.* (Emphasis added).

[53] *Id.* (Emphasis added).

[54] *Id*. (Emphasis added).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

59.     Crucially, that paragraph in the government's Bulletin continues:

*All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.* This is because, *when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.*[55]

60.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather

---

[55] *Id.* (Emphasis added).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's PHI to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.

. . . Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule . . . .[56]

Therefore, Defendant's conduct is directly contrary to clear pronouncements by the FTC and HHS.

61.    In light of, and in addition to, the federal government's own issued guidance above, news sources also warn that tracking code, like the Facebook Tracking Pixel, poses risks of violating federal privacy law and HIPAA:

Federal regulators are warning [regulated entities] hospital systems and telehealth providers about the data privacy risks of using third-party tracking technologies.

These services, like [Facebook Tracking] Pixel or Google Analytics, could violate the Health Insurance Portability and Accountability Act (HIPAA) or Federal Trade Commission (FTC) data security rules, officials said.

The FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 [regulated entities] hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps … "The compliance buck still stops with you. Furthermore, your company is legally responsible even if you don't use the data obtained through tracking technologies for marketing purposes."[57]

---

[56] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Fed. Trade Comm'n (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

[57] Heather Landi, *Regulators warn hospitals and telehealth companies about privacy risks of Meta, Google tracking tech*, Fierce Healthcare (July 21, 2023), https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Fierce Healthcare also spoke up in an April 3, 2023 article:

> Nearly all nonfederal acute care hospitals' [regulated entities'] websites track and transfer data to a third party, potentially fueling the unwanted disclosures of patients' sensitive health information and opening up that [regulated entity] hospital to legal liability, according to a recently published University of Pennsylvania analysis. [https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2022.01205]. The census of more than 3,700 hospital [regulated entity] homepages found at least one third-party data transfer among 98.6% of the websites as well as at least one third-party cookie on 94.3%, researchers wrote in Health Affairs.
>
> The hospitals' [regulated entities'] homepages had a median of 16 third-party transfers, more of which were found among medium-sized (100 to 499 beds) hospitals, nonprofit hospitals, urban hospitals, health system-affiliated hospitals and those that weren't serving the largest portion of patients in poverty, they wrote … Many of these complaints cite Facebook parent company Meta's Pixel tracker, which a June 2022 investigation from The Markup [https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites] detected on about a third of large hospitals' websites. That report found evidence that, in some instances, the sensitive data transferred to third parties met the criteria for a HIPAA violation.[58]

Health Affairs also published an article in April 2023, stating:

> By including third-party tracking code on their websites, hospitals [regulated entities] are facilitating the profiling of their patients by third parties. These practices can lead to dignitary harms, which occur when third parties gain access to sensitive health information that a person would not wish to share. These practices may also lead to increased health-related advertising that targets patients, as well as to legal liability for hospitals [regulated entities].[59]

60. This is further evidence that the data that Defendant chose to share is protected Personal Information. The sharing of that information was a violation of Class Members' rights.

## **CLASS ACTION ALLEGATIONS**

62. **Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as all natural persons in the United States who, during the class period, had a Facebook account and booked a consultation on www.idealimage.com (the "Class").

---

[58] Dave Muoio, *Almost every hospital's homepage is sending visitors' data to third parties, study finds*, FIERCE HEALTHCARE (Apr. 3, 2023), https://www.fiercehealthcare.com/providers/almost-every-hospital-homepage-sending-visitors-data-third-parties-study-finds.

[59] Ari B. Friedman, et al., *Widespread Third-Party Tracking On Hospital Websites Poses Privacy Risks For Patients And Legal Liability For Hospitals*, HEALTH AFFAIRS, Vol. 42, No. 24, April 2023, https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.01205.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

63.    Plaintiff also seeks to represent a class of similarly situated individuals defined as all natural persons in the state of California who, during the class period, had a Facebook account and booked a consultation on www.idealimage.com (the "California Subclass").

64.    Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including the use of multi-state subclasses.

65.    The "Class Period" is the time beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

66.    Excluded from the Classes is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

67.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**: At the present time, Plaintiff does not know the exact number of members of the Classes. However, given the popularity of Defendant's Website, the number of persons within the Classes is believed to be so numerous that joinder of all members is impractical.

68.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a) whether Defendant intentionally assisted a third party with tapping the lines of internet communication between itself and its patients;

(b) whether Defendant's Website surreptitiously recorded personally identifiable information, protected health information, and related communications between itself and its patients;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

(c) whether Facebook was a third-party eavesdropper;

(d) whether Defendant's disclosures of PII, PHI, and related communications constituted an affirmative act of communication;

(e) whether Defendant's conduct, which allowed Facebook – an unauthorized person – to view Plaintiff's and Class Members' PII and PHI, resulted in a breach of confidentiality;

(f) whether Defendant violated Plaintiff's and Class Members' privacy rights by using the Facebook Tracking Pixel to record and communicate their FIDs alongside their confidential medical communications;

(g) whether Plaintiff and Class Members are entitled to damages under the ECPA, CIPA, CMIA, or any other relevant statute;

(h) whether Defendant intentionally recorded Plaintiff and Class Members' communications under the ECPA and CIPA;

(i) whether Plaintiff and Class Members' PII and PHI are content under the ECPA and CIPA; and

(j) whether Defendant's actions violated Plaintiff's and Class Members' privacy rights as provided by the California Constitution.

69.     **Typicality (Fed. R. Civ. P. 23(a)(3))**: Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, registered for a consultation on Defendant's Website, and – without her consent – had her PII and PHI collected and disclosed by Defendant.

70.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the ECPA and CIPA.  Plaintiff and her counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiff nor her counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

71.    **Superiority (Fed. R. Civ. P. 23(b)(3))**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable. Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Electronic Communications Privacy Act,**
**18 U.S.C. § 2511(1)**

72.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

73.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

74.    The ECPA protects both sending and the receipt of communications.

75.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

119.

76.    The transmission of Plaintiff's private and confidential information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

77.    The transmission of the private and confidential information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

78.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

79.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

80.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

81.    The following instruments constitute "devices" within the meaning of the ECPA:

  a)  The computer codes and programs Facebook used to track Plaintiff and Class Members communications while they were navigating the Website;

  b)  Plaintiff's and Class Members' browsers;

  c)  Plaintiff's and Class Members' mobile devices;

  d)  Defendant and Facebook's web and ad servers;

  e)  The plan Defendant and Facebook carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

82.    Plaintiff and Class Members' interactions with Defendant's Website are electronic

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

communications under the ECPA.

83.   By utilizing and embedding the Facebook Tracking Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

84.   Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications through the Facebook Tracking Pixel, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' private and confidential information to third parties, such as Facebook.

85.   Defendant intercepted or assisted in the interception of communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding private and confidential information, including their Facebook ID and treatment information.  This confidential information was then monetized for targeted advertising purposes.

86.   By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

87.   By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

88.   Defendant intentionally intercepted or intentionally assisted in the interception of the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

89.   The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3).  This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[60]

90.     Plaintiff's information that Defendant assisted Facebook in intercepting qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6.  Defendant used the wire or electronic communications to increase its profit margins.  Defendant specifically used the Facebook Tracking Pixel to track and utilize Plaintiff's and Class Members' private and confidential information for financial gain.  Similarly, Facebook intended to intercept Plaintiff's and Class Members' private and confidential information for its own financial gain.

91.     Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

92.     Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the Facebook Tracking Pixel.  Plaintiff and Class Members had a reasonable expectation that Defendant would not intercept or assist in the interception of their private and confidential information without their knowledge or consent.

93.     The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

94.     As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §

---

[60] 42 U.S.C. § 1320d-6.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

2510, *et seq.* under 18 U.S.C. § 2520.

## COUNT II
### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631

95.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

96.     The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630–638.  CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

97.     A person violates California Penal Code § 631(a), if:

by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . . Cal. Penal Code § 631(a).

98.     Further, a person violates Section 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

99.     To avoid liability under Section 631(a), a defendant must show it had the consent of all parties to a communication.

100.    At all relevant times, Defendant aided, agreed with, and conspired with Facebook to track and intercept Plaintiff's and Class Members' internet communications while accessing https://www.idealimage.com.  These communications were intercepted without the authorization

1    and consent of Plaintiff and Class Members.

2        101.    Defendant, when aiding and assisting Facebook's wiretapping and eavesdropping,

3    intended to help Facebook learn some meaning of the content in the URLs and the content the

4    visitor requested.

5        102.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under

6    the CIPA, and even if they do not, the Facebook Tracking Pixel falls under the broad catch-all

7    category of "any other manner":

8        (a)    The computer codes and programs Facebook used to track Plaintiff and Class

9              Members' communications while they were navigating https://www.idealimage.com;

10       (b)    Plaintiff's and Class Members' browsers;

11       (c)    Plaintiff's and Class Members' computing and mobile devices;

12       (d)    Facebook's web and ad servers;

13       (e)    The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and

14             Class Members' communications while they were using a web browser to access or

15             navigate of https://www.idealimage.com;

16       (f)    The computer codes and programs used by Facebook to effectuate its tracking and

17             interception of Plaintiff's and Class Members' communications while they were using

18             a browser to visit https://www.idealimage.com; and

19       (g)    The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's

20             and Class Members' communications while they were using a web browser or mobile

21             device to visit https://www.idealimage.com.

22       103.    The information that Defendant transmitted using the Facebook Tracking Pixel,

23    such as Facebook ID and booking information constituted sensitive and confidential, personally

24    identifiable information.

25       104.    As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting

26    third parties to receive its customers' sensitive and confidential online communications through

27    https://www.idealimage.com/ without their consent.

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

105.     As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, California Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

106.     Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## <u>COUNT III</u>
**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56.10**

107.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

108.     Under the California Confidentiality of Medical Information Act, California Civil Code § 56.10 ("CMIA"), providers of health care are prohibited from disclosing medical information relating to their patients without a patient's authorization. Medical information refers to:

> any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. "Individually Identifiable" means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual . . . .

109.     Plaintiff and Class Members are patients under the definition of the CMIA because Plaintiff and Class Members received "health care services from a provider of health care" and the information Defendant shared to Facebook was "medical information pertain[ing]" to Plaintiff and Class Members. Cal. Civ. Code § 56.05(m).

110.     Defendant is a "provider of health care" as defined in California Civil Code section 56.05(p) because Defendant offers medical services that are performed by doctors and medical professionals.  Defendant is also considered a "provider of health care" under California Civil

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Code § 56.06, subdivisions (a) and (b), because Defendant's Website maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, of for the diagnoses, treatment, or management of a medical condition.

111.    Therefore, as a provider of health care, Defendant is subject to the requirements of the CMIA and had an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

112.    As set forth hereinabove, a Facebook ID is an identifier sufficient to allow identification of an individual.  Along with patients' Facebook ID, Defendant disclosed to Facebook several pieces of information regarding its patients' use of Defendant's Website, which included, but was not limited to the specific medical service(s) patients were seeking when registering for consultations on the Website.

113.    This patient information was derived from a provider of health care regarding patients' medical treatment and physical condition. Accordingly, it constituted medical information pursuant to the CMIA.

114.    As demonstrated hereinabove, Defendant failed to obtain its patients' valid authorization for the disclosure of medical information.

115.    Pursuant to CMIA § 56.11, a valid authorization for disclosure of medical information must: (1) be "[c]learly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, information set forth in Defendant's Website Privacy Policy does not qualify as a valid authorization.

116.    Based on the above, Defendant violated the CMIA by disclosing its patients' medical information with Facebook along with the patients' Facebook IDs.

117.    Under the CMIA, a patient may recover compensatory damages, punitive damages

not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information. Cal. Civ. Code §56.35. Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information. Cal. Civ. Code §56.36.

118.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class Members have been injured by the violations of California Penal Code § 635, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV
### Invasion of Privacy Under California's Constitution

119.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

120.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications and PHI; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

121.    At all relevant times, by using the Facebook Tracking Pixel to record and communicate patients' Facebook ID's alongside their sensitive and confidential online medical communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

122.    Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, health information, and other data would remain confidential, and that Defendant would not install wiretaps on https://www.idealimage.com.

123.    Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' PII and PHI to third parties.

124.    This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications. Moreover, it constituted an egregious breach of the

societal norms underlying the privacy right.

125.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    For a determination that this action is a proper class action;

(b)    For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(c)    For an order declaring that Defendant's conduct violated the statutes referenced herein;

(d)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(e)    For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

(f)    For punitive damages, as warranted, in an amount to be determined at trial;

(g)    For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

(h)    For prejudgment interest on all amounts awarded;

(i)    For injunctive relief as pleaded or as the Court may deem proper;

(j)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

(k)    For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff on behalf of herself and the proposed Classes, demands a trial by jury for all of the claims asserted in this Complaint so triable.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Dated:  December 10, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  /s/ *Sarah N. Westcot*

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 2100
Miami, FL 33133-5402
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-mail: swestcot@bursor.com

*Attorney for Plaintiff*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED